1
2
3
4
5                          IN THE UNITED STATES DISTRICT COURT

6                      FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    JASON LOPEZ,                              Case No.  19-cv-05727-CRB

9                 Plaintiff,

10          v.                                 **ORDER GRANTING SUMMARY
                                               JUDGMENT**
11   WINCO HOLDINGS, INC., et al.,

12               Defendants.

13          Plaintiff Jason Lopez brought suit against his former employer, WinCo Foods,[1] in

14   connection with his termination.  See Compl. (dkt. 1).  WinCo now moves for summary judgment

15   on all of Mr. Lopez's claims.  See MSJ (dkt. 39).  Because there is no genuine dispute as to any

16   material fact and WinCo is entitled to judgment as a matter of law, the Court grants WinCo's

17   motion.  See Fed. R. Civ. P. 56(a).

18   **I.      BACKGROUND**

19          **A.     Lopez's Employment History**

20                 **1.      Early Employment**

21          Mr. Lopez began his employment with WinCo in 1994 as a cart clerk at its grocery store in

22   Reno, Nevada.  Lopez Depo. (dkt. 39-2) at 15:23–25.  He worked in a variety of positions at a

23   variety of WinCo grocery stores—the last two decades of which were all in Northern California.

24   Id. at 16:1–21:5.  In July 2012, he was promoted to store manager.  Id. at 21:6–7; 33:13–15;

25   34:20–25.

26          In July 2015, Mr. Lopez transferred to a WinCo store in Pittsburg, California.  Id. at

27   ───────────────

28   [1] Defendants are WinCo Holdings, Inc. and WinCo Foods, LLC.  For ease of reference, this order
     refers to both as "WinCo."

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

45:11–23.  Over the three-and-a-half years that Mr. Lopez worked at that store, he was threatened and assaulted multiple times by customers and shoplifters.  Id. at 50:20–53:20.  He became afraid and dreaded going to work.  Id. at 53:5–6.  Mr. Lopez was one of the top three managers in the region in 2017.  Lopez Decl. (dkt. 45-2) ¶ 2.  Although Mr. Lopez contends that he always performed his job well, he "started to kind of develop depression" around early 2017.  Lopez Depo. at 58:8–25.  There is no indication that he informed anyone at WinCo about his depression at the time.

### 2.    January 2018 Incident at Pittsburg Store

In January 2018, Senior VP of Retail Operations Nancy Lebold and VP of Food Safety Kim Lamborn visited the Pittsburg store and "found unacceptable and intolerable store conditions."  Lopez Depo. Ex. 6.  Among the conditions that they noted in a January 31, 2018 written warning to Mr. Lopez were:

**Grocery**
- There were no useable carts in the lobby.
- The wall was decimated with several empty items and lots of cardboard.
- There were a lot of holes down the grocery aisles, not all of these were explainable from warehouse out of stocks.
- The dairy cooler was dirty.
- There were many holes in the dairy doors.  Product had not been pushed forward, which makes it difficult for customers to reach items.

**Variety**
- Variety sections throughout the store were empty, low or in total disarray.
- The front check stands were cluttered in places and empty in other places.
- The promo section as empty and/or low.  The variety backroom was unorganized and in disarray.

Additionally, there were numerous concerns throughout the perimeter departments:

**Bakery:**
- Many products were low.

**Produce**
- Overall poor conditions throughout the department.
- Many products were low.
- There was plunder throughout the department.
- The bin of bagged potatoes was empty.
- There was moldy fruit on display.
- There were numerous empty roll bags in the department.
- The produce floor and wet rack were dirty,
- There was a cart full of produce go backs abandoned in common area. This product had come up to ambient temperature.

2

**Deli**

- The department was low on many products.

There were also many issues surrounding food safety and sanitation in the deli:

- Ingredients were stored in the production room.  These ingredients had to be destroyed since they were not stored in an area that was 41° F or less.
- Items were found that were not dated and/or the dating method used was not consistent.
- The seafood preparation sink held a plastic bin filled with frozen [fish] that was being slacked out at ambient temperature.
- There was a large stack of soiled towels that was leaning up against the wall next to the ware washing sink.  The soiled towels were over 2 feet tall and spilled over onto the floor.  This was in direct sight of customers.
- The reach in cooler contained broken colanders, many clear lids, and miscellaneous tools, along with undated product.
- There was a large stack of soiled tools and containers on the are washing sink.  The water in the sink appeared to be dirty with a large amount of organic material floating.
- The floor was heavily soiled with miscellaneous pieces of paper thrown about.
- In the poultry cooler, the breading tote and rolling cart was heavily soiled.  The tote was empty of product, however it was completely layered with a buildup of product.  The hanging aprons were heavily soiled.  Numerous dirty brooms and miscellaneous cleaning tools were stored in the cooler in close proximity to product.
- There was fully cooked popcorn chicken stored in the raw poultry cooler.

Id.

The warning explained that as a store manager, Mr. Lopez was "expected to walk the sales floor . . . on a regular basis to [assess] store conditions and then develop a plan to remedy any issues" and that "[i]t was obvious that you had not completely walked the store in its entirety to ensure each department was up to Company standards."  Id.  The warning further stated that Mr. Lopez was "expected to walk the store at the beginning of [his] shift and throughout the day."  Id. And it cautioned Mr. Lopez that "[f]ailure to meet minimum standards and expectations moving forward and/or further violation of any company policy will result in further progressive disciplinary action up to and including your immediate discharge of your at-will employment." Id.

Mr. Lopez believed that the warning was not warranted.  Lopez Depo. at 85:17–22.  He recalled that it had been "an incredibly busy day there."  Id. at 63:24–64:7.  While he agreed that "[w]e had a bad day," he also felt that "some of the things" on the warning were not true, and that he had asked for help on some of the things in the warning, specifically the theft of shopping carts.

3

Id. at 85:23–86:11.

### 3.    Leaving Pittsburg

#### a.    Transfer Request

On December 10, 2018, shortly after a knife altercation with a shoplifter, Mr. Lopez sent an email to his District Manager, Pete Miller, Director of Human Resources JoAnn Pingree, and LeBold.  Lopez Depo. Ex. 7.  He explained that the Pittsburg store "sucks the life out of you," and that he had "become more irritable, angry, disconnected from [his] family and basically depressed than [he] thought possible."  Id.  He mentioned having "thoughts of self harm and hopelessness instead of item movement and sales."  Id.  He continued: "This brings me to the main reason for my email.  When the opportunity comes up, I'd like to request a lateral transfer to Northern Nevada."  Id.  He described some of his families' negative experiences with the Pittsburg area, and urged:

> I know there's no guarantees or promises in this business.  I know I'm skating on thin ice as it is with the struggles we've had at [the Pittsburg store], and I know I'd be lucky to have a job with WinCo still if an opening does come up.  I know it could be a long time until a spot opens up again if ever.  I would just ask that you please heavily consider me if a spot does open. . . . I also don't want to have to leave the company that I have been at for 24 years.

Id.  He added that he was "not a danger to myself or others" but "may ask for an afternoon off occasionally to try to see a counselor in hopes that I can make my personal life better despite my professional life."  Id.

The following day,[2] Ms. Pingree went to the Pittsburg store to meet with Mr. Lopez.  Lopez Depo. at 92:16–22.  She "express[ed] her concern about" his email, and filled out a workers' compensation form with him.  Id. at 93:2–5.  Ms. Pingree also discussed the transfer request with Mr. Lopez.  Id. at 114:3–7.  She asked him where he wanted to transfer, and he said that he preferred the Reno area.  Id. at 114:9–12.  He explained that his wife was considering moving back to the Reno area and that his daughter was receiving treatment in Reno.  Tambling Decl. Ex. A (Lopez Depo) at 105:2–14.  There were only two stores in the Reno area at the time,

---

[2] WinCo and Mr. Lopez agree that this was the next day, see MSJ at 5 ("[t]he very next day"); Opp'n at 5 ("December 11, 2018 meeting"), but the cited deposition testimony does not say when the meeting occurred.

and though Mr. Lopez understood that "WinCo wouldn't be able to just transfer [him] to one of those locations without transferring somebody else out," he thought "[p]erhaps one of those managers had been asking to transfer somewhere else too.  Maybe they could work it in."  Id. at 114:13–115:19.  There is only one store manager per location.  Id. at 116:3–7.

Mr. Lopez also told Ms. Pingree that he would be open to transferring to the Roseville, Folsom, or Tracy stores.  Tambling Decl. Ex. A (Lopez Depo.) at 116:9–16.  His goal was "to get out of that Pittsburg store and hopefully move to an area where [he] had a larger support network." Id. at 104: 22–105:1.  Roseville and Folsom "were next closest to northern Nevada" and Tracy was close to where he was currently living, near the Pittsburg store.  Id. at 116:17–117:2.  He later testified that he wanted "to get out of Pittsburg without being put into a similar situation."  Id. at 117:9–10.

There were no openings at the time.  Miller Depo. (dkt. 39-3) at 60:19–61:6 ("There were no openings, so I suppose I wouldn't look.  I mean, I know . . . my stores have a manager."), 82:23–83:1 (neither Reno store had openings).  WinCo did not transfer Mr. Lopez immediately; nor did Mr. Miller recall asking other store managers if they would transfer stores to accommodate Mr. Lopez.  Tambling Decl. Ex. C (Miller Depo.) at 81:13–82:13.  In addition, while Ms. Pingree agrees that "transfer to a different store can be a form of accommodation," Tambling Decl. Ex. F (Pingree Depo.) at 175:13–15, she did not give Mr. Lopez any reasonable accommodation paperwork at the time of their conversation, id. at 174:1–9.  She believed that he had access to such paperwork "because he used [it] on a frequent basis at his store level with his store-level employees."  Id. at 174:4–6.

On December 13, 2018, Mr. Lopez sent Ms. Pingree a doctor's note diagnosing him with Acute Stress Disorder.  Tambling Decl. Ex. G (12/12/18 doctor's note), Ex. F. (Pingree Depo.) at 119:16–120:6.  The note indicates that Mr. Lopez was able to work "regular duty," and does not recommend anything relating to a transfer.  Supp. Pingree Decl. ¶ 4, Ex. B; see also Supp. Pingree Decl. ¶ 4 ("I never received any medical documentation from Mr. Lopez indicating that a medical professional recommended that he transfer out of the Pittsburg store.").

//

### b.    Transfer

In late December, a store manager position opened up in Vacaville, and WinCo offered Mr. Lopez the opportunity to transfer to that store.  Miller Depo. at 83:5–10.  Mr. Lopez accepted the transfer, hopeful that "there would be less chances that I would be assaulted or get beat up." Lopez Depo. at 121:16–18.  Ms. Pingree "had mentioned it was a challenging store in regards to like human resource issues with employees" but Mr. Lopez had not heard anything else about the Vacaville store.  Tambling Decl. Ex. A (Lopez Depo.) at 120:10–23.  He began working at the Vacaville store on January 13, 2019.  Lopez Depo. at 129:23–24.  He does not recall being assaulted while employed there.  Id. at 121:21–24.

On January 13, 2019, WinCo filled the vacancy Mr. Lopez left at the Pittsburg store with the store manager from the Tracy store, and filled the vacancy at the Tracy store with an assistant store manager from the Reno store.  See Opp'n at 6 (citing Tambling Decl. Ex. B (WinCo Partial Transfer Records) at D001107, D001111).

### c.    Workers' Compensation, Counseling

On January 28, 2019, Mr. Lopez stated on his proof of workers' compensation claim form that he was experiencing depression, anxiety, anger, thoughts of self harm, and withdrawal from family.  See Tambling Decl. Ex. I (WC forms), LOPEZ000370–75.  Mr. Lopez began seeing a therapist named Dr. Fowle.  Id. at LOPEZ000371.  He saw Dr. Fowle a total of three or four times. Lopez Depo. at 93:14–24, 112:5–6.  One time, in April 2019, when he was in a counseling session with Dr. Fowle, Mr. Miller called to ask him where he was, and Mr. Lopez told him.  Tambling Depo. Ex. A (Lopez Depo.) at 123:12–17.

Mr. Lopez states that he had some difficulty getting time off of work to see Dr. Fowle because he had to coordinate with his district manager, Mr. Miller.  See Lopez Depo. at 112:7–18. He explained that when a store manager is not able to work, an assistant manager needs to be there, and that he had difficulty at times having coverage to attend his appointments.  Id. at 113:1–10; see also Pingree Decl. (dkt. 39-4) at ¶ 5 ("As a Store Manager, when Mr. Lopez required time off work for medical appointments, he merely needed to schedule those appointments for times during the week when one of his two Assistant Managers was able to be present in the store.").

6

While Mr. Miller did not deny Mr. Lopez's request to take time off, Mr. Lopez states that "there were times when we had to skip sessions because I was not able to make it or at least push those sessions back." Lopez Depo. at 113:6–15. Mr. Lopez did not have any further discussion with Ms. Pingree, Mr. Miller, or Ms. Lebold about getting time off of work to see a counselor "due to the fact that I was seeing the work comp doctor." Id. at 112:1–6; see also Pingree Decl. ¶ 5 ("If for some reason [scheduling an appointment when an Assistant Manager was available] was not possible, Mr. Lopez would merely have needed to contact [Mr. Miller] or me for assistance obtaining coverage for his store during his absence. He never did so."). Nor did Mr. Lopez consider "filing a request for FMLA in order to get intermittent time off to see a counselor" "because of the work comp that was going on at the time." Lopez Depo. at 113:16–20.

### 4.    Incidents at Vacaville Store

Mr. Lopez worked at the Vacaville store for exactly two months. Id. at 129:23–24, 15:13–15. During that time, there were three notable incidents reflecting on his job performance, with increasingly severe disciplinary responses.

### a.    March 17 and 24, 2019 Incidents

On March 17 and 24, a customer who was the son of a WinCo employee visited the Vacaville store and took photos of the conditions in the produce department. Miller Depo. at 109:20–110:1. He sent the photos to Ms. Lebold, who forwarded them to Mr. Miller. Id. at 110:18–119:1. The pictures showed empty boxes of fruit on display and bad (rotten) fruit. Id. at 113:2–114:3; Miller Depo. Ex. 8.

Mr. Miller determined that Mr. Lopez had not been at work on either March 17 or March 24, but that as store manager, it was Mr. Lopez's responsibility to train his staff, to ensure that the staff who were on duty were aware of the problems, and to take steps to prevent those problems from recurring. Miller Depo. at 103:10–25. Mr. Miller sent the photos to Mr. Lopez and spoke with him about them over the phone, saying "We've got to get this fixed. This shouldn't be happening." Id. at 114:9–14. Mr. Miller told him "that poor store conditions (such as those found on March 17 and March 24) were unacceptable and that serious consequences would occur if such conditions were to take place again in the future." Id. at 122:15–19. Mr. Lopez talked to an

7

1   assistant manager who "made it sound like it wasn't bad," but Mr. Lopez stated that he could not

2   disagree with Mr. Miller about the condition of the store as he was not there.  Lopez Depo. at

3   146:7–15.

4                          **b.       March 26, 2019 Incident**

5          On March 26, 2019, a day when Mr. Lopez was working, Mr. Miller visited the Vacaville

6   store to conduct an inspection.  Miller Depo. at 116:7–11.  He found that "[t]he condition of the

7   produce department was particularly concerning."  Id. at 117:2–4.  There were empty produce

8   bins, and the department had not been properly culled, meaning that bad product had not been

9   removed.  Id. at 117:5–13.  Numerous items were out of stock.  Id. at 117:14–18.  "The whole

10  department [was] in complete shambles."  Id. at 131:25; see also Supp. Pingree Decl. (dkt. 46-2)

11  Ex. A (photos taken by Mr. Miller of Vacaville store from March 26).  This was "particularly

12  concerning" to Mr. Miller, "since we had recently discussed the importance of you focusing your

13  attention on this critical department."  Miller Depo. Ex. 9.  Mr. Miller noted that Mr. Lopez had

14  said at the time that when he walked the store in the morning, he had noticed that the produce

15  department was behind, but he felt that they would get caught up.  Id.[3]  Mr. Miller found it "very

16  disappointing and completely unacceptable that at the time of [the] store visit (approximately

17  noon)[, Mr. Lopez] had failed to return to the [produce] department to check the status of the

18  conditions and ensure the department was ready for our customers."  Id.  WinCo expected store

19  managers to walk the store throughout the day, as WinCo had reminded Mr. Lopez in his January

20  31, 2018 written warning.  See Lopez Depo. Ex. 6.

21         Mr. Lopez stated that he "generally would walk the store and then go back and follow up

22  again" but that that day "was kind of unique" and so he "wasn't able to circle back around."

23  Lopez Depo. at 150:9–18.  He felt that the day of the inspection was "kind of an outlier more than

24  the norm."  Id. at 150:16–18.  Mr. Lopez felt that the produce department had improved

25  dramatically in the couple months that he was there.  Id. at 154:8–18.

26

27  _____

28  [3] This is somewhat different from Mr. Lopez's deposition testimony, in which he stated that "[i]t was kind of an odd situation or unique situation" because they were remodeling the department at that time.  Lopez Depo. at 149:9–17.

United States District Court
Northern District of California

### c.     Suspension

On April 9, 2019, WinCo issued Mr. Lopez a Notice of Disciplinary Suspension, suspending him from work between April 10 and April 16, 2019.  See Lopez Depo. Ex. 9.  The Suspension Notice detailed Mr. Lopez's January 2018 written warning, his district manager's having reinforced with Mr. Lopez the expectation that he walk the sales floor "on a regular basis to [assess] store conditions and then develop a plan to remedy any issues," his January 13, 2019 transfer, the March 17 and 24, 2019 incidents, and the March 26, 2019 inspection.  Id.  It stated, "WinCo Foods takes great pride in having a reputation of clean, friendly, well-stocked stores. Under your management, the Pittsburg store #63, and now the Vacaville store #60 has not consistently demonstrated this."  Id.  It continued:

> You are expected to ensure that all areas of the store meet WinCo
> Foods' standards, not just operationally but in appearance and in
> presentation.  You are expected to walk the store at the beginning of
> your shift and throughout the day to ensure your employees are
> following your directives, and you are expected to communicate
> with the members of your management team (Assistant Store
> Managers and the Department managers), as well as with hourly
> employees in the store.  You are expected to work together as a
> management team to ensure your store as a whole is up to WinCo
> Foods' standards.  In addition, you are also encouraged to make use
> of the numerous resources available to you when difficulties arise by
> contacting me, Pete Miller (District Manager), JoAnn Pingree
> (Human Resources), and/or other such appropriate individuals.

Id.  It cautioned: "Any failure to meet minimum standards and expectations moving forward and/or further violation of any company policy will result in further disciplinary action up to and including immediate discharge of your at-will employment at WinCo Foods."  Id.

Mr. Lopez was surprised that he was suspended, as Ms. Pingree had told him that WinCo would write up another employee, but that Mr. Lopez would not be disciplined for the incident. Lopez Depo. at 155:18–22.  When he learned of the suspension, Mr. Lopez broke down and cried in front of Mr. Miller and Ms. Pingree because he "was still dealing with the stress at that time and still dealing with depression."  Tambling Decl. Ex. A (Lopez Depo.) at 155:3–10.

### d.     April 20, 2019 Incident

Mr. Lopez returned to work on April 17, 2019, four days before Easter Sunday.  Lopez Depo. at 166:24–167:9.  The schedule for the upcoming week and holiday weekend had been

9

United States District Court
Northern District of California

1   written in Mr. Lopez's absence, and Mr. Lopez does not recall reviewing the schedule to

2   determine whether appropriate staffing had been scheduled.  Id. at 168:8–18.  Appropriate staffing

3   had not been scheduled; the store was understaffed on April 20, 2019.  Id. at 198:6–10, 199:21–

4   200:10 (agreeing that the schedule did not sufficiently staff the store but contending that Mr.

5   Lopez should not be responsible for it).  The employee designated as produce opener had not

6   come in.  Tambling Decl. Ex. F (Pingree Depo.) at 192:6–10.

7       Mr. Miller visited the Vacaville store on April 20, 2019 at around 12:30 p.m.  Lopez Depo.

8   at 187:4–8; Lopez Depo. Ex. 12.  He found that the Easter promotion aisle "was just in complete

9   disarray," as if it had been "shopped so hard from the day before" and "nobody had even [come]

10  in to face it up, make it look good.  It was just shambles."  Miller Depo. at 194:13–25.  Mr. Lopez

11  was checking out customers at the registers.  See Lopez Depo. at 170: 14–17, 190:4–7.

12  Conditions Mr. Miller observed at the store included:

> **Produce**
> - The bag salad area had numerous out-of-stocks.
> - The entire pre-packaged individual serving salad display was almost empty.  There were only a few of these salads available for our customers.
> - The margarita salt and specialty seasoning display included a crate that was almost empty.  The rest of this display was in disarray.
> - There were two watermelon bins on display.  One of the bins was so low that customers would have difficulty getting this heavy product out of the display.
> - There were three large boxes of red potatoes on display.  These three boxes only had approximately ten potatoes for sale.
> - There were three boxes of white potatoes on display.  One of these boxes was completely empty.  The other two boxes had only a thin layer of potatoes at the bottom of each box.
> - There were six boxes of Klondike (3lb.) bagged potatoes on display.  In this entire six foot sales space there were only approximately 5 bags of potatoes available for sale.
> - There were three boxes of fresh pineapples on display.  In these boxes there were only three (3) pineapples available for sale.
> - Throughout the department there were various other displays that were not full, faced and/or visually acceptable for our customers.  Most notable products include the baby carrots, cucumbers, bagged sweet peppers, collard greens, artichokes, green onions, bagged [green] beans and Curly mustard. . . .
> **Variety:**
> - The Easter candy aisle was in total disarray.
> - There were many empty candy display boxes left on the shelves.
> - The items that were on the shelves were not faced.  The entire aisle was unorganized and disheveled.

- There was an abundance of shelf space that was left completely empty.
  **Throughout the store there were additional issues:**
- The beer cooler and bomber beer case had numerous out-of-stocks.  Th product that was available had not been faced.
- The chip aisle had numerous out-of-stocks and had an overall messy appearance.
- There was debris on the floor of the men's bathroom.
- The bulk foods spice area was dirty.

Miller Depo. Ex. 23.  The lines at the store's registers were also "atrocious," as "lines [were] backed up to the bread aisle."  Id.

Mr. Lopez attributed the condition of the store to it being "one of those chaotic days." Lopez Depo. at 170:8.  He continued, "I'm sure you can imagine in a grocery store before Easter, it was pretty intense."  Id. at 170:8–10.  Mr. Lopez had arranged for an assistant manager from another store to work through the weekend.  Tambling Decl. Ex. N (5/17/19 email).  On the day of April 20, 2019—but not in the days leading up to April 20, 2019—Mr. Lopez had tried to get more cashiers to come into work, but it was hard to get people to come in on an off-day during a holiday weekend.  Lopez Depo. at 202:4–203:2.  In Mr. Miller's view, the schedule "was written by somebody with very little experience in schedule writing" as there were not nearly enough cashier shifts for the Saturday before Easter.  Miller Depo. at 169:16–170:15.  Mr. Miller believed that Mr. Lopez should have seen the schedule on April 17 and started to ask additional employees if they could work that Saturday; if no one was available, he could have picked up the phone and called Mr. Miller, or reached out to other stores to see if people would work.  Id. at 171:2–15.

In addition to the staffing issues, Mr. Lopez did not adequately walk the store on April 20, 2019.  Upon review of surveillance footage of the Vacaville store on April 20, 2019, WinCo determined that Mr. Lopez had not walked the Easter promotion aisle at all until after Mr. Miller had arrived, and did not check the produce department again, following his initial morning walk-through, until Mr. Miller arrived.  Id. at 154:4–155:13; Miller Depo. Ex. 11.

### 5.   April 26, 2019 to May 13, 2019 Leave of Absence

On April 26, 2019, before any discipline had occurred in connection with the April 20, 2019 incident, Mr. Lopez emailed Mr. Miller and Ms. Pingree to say that he was "really not feeling well" and needed to take a sick day.  Pingree Decl. Ex. A.  The next day, he emailed again

United States District Court
Northern District of California

to say that his doctor was taking him off of work until May 13, 2019, after his next appointment. Pingree Decl. Ex. B ("I'm stuck in this cycle of my health affecting my work which affects my health and so on."). Ms. Pingree responded that Mr. Lopez should "be sure to contact FMLA Source to apply for FMLA protections" and notify payroll about his leave. Id.[4]

### 6.   Termination

While Mr. Lopez was on leave, Mr. Miller, Ms. Pingree, and Ms. Lebold decided to terminate his employment. Miller Depo. at 34:6–22. Mr. Miller felt that Mr. Lopez brought discredit to WinCo, as the company's motto is "full, fresh, and clean" but "that store is completely filthy and it's—I'll just use the word 'shambles'; right? It's in complete disarray. . . . We don't operate that way." Id. at 206:1–10. WinCo informed Mr. Lopez of his termination upon his return to work on May 13, 2019. Lopez Depo. at 15:13–15; Miller Depo. Ex. 12. Mr. Miller sent Mr. Lopez a Notice of Separation in which he outlined Mr. Lopez's "ongoing performance concerns" starting with the January 2018 written warning and continuing through the incidents at the Vacaville store. Id. He wrote:

> Unfortunately, even upon this store transfer to a different store location, you failed to adequately fulfill your job responsibilities in ensuring the store conditions were acceptable for our customers. Due to reports of ongoing substandard store conditions, I coached you on numerous occasions regarding the significance of maintaining store conditions throughout the entire store. Even after these matters were brought to your attention, you failed to take appropriate steps to rectify the issues.

Id. Mr. Miller detailed the issues he observed on April 20, 2019, and stated, "This is especially disturbing since you have been advised on numerous occasions that the conditions of the produce department are paramount in how our customers view the store. Even after numerous discussions and being disciplined for unacceptable conditions, you still failed to take appropriate actions to ensure the department was ready for our customers." Id. He continued: "Jason, we have

---

[4] Mr. Lopez states in his opposition brief that "Even though WinCo gave Mr. Lopez the time off, WinCo denied MR. Lopez FMLA leave." Opp'n at 10 (citing Tambling Decl. Ex. R (FMLA denial) at C000664). The cited document, from May 17, 2019, states "FMLA/STATE DENIED 4/26/19–5/12/19." See Tambling Decl. Ex. R (FMLA denial) at C000664. At the motion hearing on August 19, 2019, however, Mr. Lopez conceded that he was granted FMLA even if it was not designated as such.

United States District Court
Northern District of California

1    discussed before that as Store Manager, you are responsible for all areas of the store, including but

2    not limited to the overall appearance of the store. . . . As has been explained and discussed before,

3    your lack of attention to this critical area affects WinCo Foods' and the Vacaville store's ability to

4    attract and retain customers and sell groceries."  Id.  Because Mr. Miller found that Mr. Lopez

5    "acted in a manner contrary to the interests of WinCo and below the standards we expect," he

6    informed Mr. Lopez that his employment was terminated immediately.  Id.

7        Mr. Lopez disagrees with this characterization of his work performance.  He notes that

8    WinCo did not discipline him once between 1994 and January 2018.  Lopez Decl. ¶ 2.  A Regional

9    VP at WinCo told him that he was being sent to "the struggling Pittsburg store because [his] skills

10   would benefit" it.  Id. ¶ 3.  He felt that when he got to the Vacaville store, it was in bad shape, and

11   that "[w]hile I was there, we made strides."  Lopez Depo. at 151:12–15; see also id. at 151:21–23

12   ("I made so much progress in that store in the short time that I was there.").  He asserts that the

13   Vacaville "store was dirty, in poor repair, dimly lit" and "needed painting in many areas," when he

14   arrived, and that both employee morale and customer service improved in his time there.  Id. at

15   152:18–22.  He also states that the produce department at the Vacaville store was the worst in the

16   division and had improved during his time there.  Id. at 152:23–153:1.  Employees told him that it

17   had "improved drastically" in the months he was there.  Id. at 154:13–14.

18       A group of employees from the Vacaville store sent Ms. Pingree a letter expressing support

19   for Mr. Lopez following his termination.  Tambling Decl. (dkt. 45-1) Ex. F (Pingree Depo.) at

20   227:10–18; Tambling Decl. Ex. U (Letter).  This unsigned letter is of meager evidentiary value.

21   Mr. Lopez also submits a declaration from the previous store manager at the Vacaville store, Tony

22   Mahle.  Mahle Decl. (dkt. 45-3).  Mr. Mahle was "shocked" that WinCo terminated Mr. Lopez, as

23   he asserts that Vacaville "was always a struggling store" and always had a problematic produce

24   department, with understaffing and bad produce, and yet he was never written up or disciplined.

25   Id. at ¶¶ 3, 5–8, 11.[5]

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [5] Significantly, WinCo notes that Mr. Lopez never disclosed Mr. Mahle in his initial disclosures,
     and argues that the Court should strike his declaration.  See Reply (dkt. 46) at 7 n.8 (citing Fed. R.
28   Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule
     26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a

United States District Court
Northern District of California

United States District Court
Northern District of California

1    About a month after Mr. Lopez was terminated, approximately six managers (presumably

2    store managers) were moved to different stores.  Tambling Decl. Ex. C (Miller Depo.) at 98:18–

3    21.  Less than six months after Mr. Lopez was terminated, the new store manager in Vacaville had

4    the store fully staffed.  See Fitch Decl. Ex. B (Seashore Depo.) at 138:22–139:2.

5        **B.      Litigation History**

6    After exhausting his administrative remedies, Mr. Lopez brought suit in September 2019.

7    See Compl.  He brings claims for: (1) disability discrimination in violation of the Fair

8    Employment and Housing Act (FEHA); (2) failure to provide reasonable accommodation in

9    violation of FEHA; (3) failure to engage in the interactive process in violation of FEHA; (4)

10   retaliation in violation of FEHA; (5) failure to prevent discrimination, harassment, and retaliation

11   in violation of FEHA; and (6) Family and Medical Leave Act (FMLA) interference.  Id. at ¶¶ 47–

12   104.  WinCo now moves for summary judgment on each claim.  See MSJ.

## II.   LEGAL STANDARD

14   Summary judgment is proper where the pleadings, discovery, and affidavits show that

15   there is "no genuine dispute as to any material fact and the [moving] party is entitled to judgment

16   as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome

17   of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a

18   material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

19   the nonmoving party.  Id.

20   The moving party for summary judgment bears the initial burden of identifying those

21   portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine

22   issue of material fact.  Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  Where the moving

23

24   motion, at a hearing, or at a trial"); see also Fitch Decl. (dkt. 46-1) Ex. A (Plaintiffs' Initial
     Disclosures).  Mr. Lopez conceded at the motion hearing that he only disclosed "WinCo
25   employees" in his initial disclosures and did not disclose Mr. Mahle by name until his
     supplemental disclosures on August 16, 2021—three days before the motion hearing.  This is
26   hardly adequate notice.  See Chapman v. Pier 1 Imports (U.S.) Inc., 870 F. Supp. 2d 995, 1002
     (E.D. Cal. 2012).  Nor should it have been clear to WinCo that Mr. Lopez would rely on evidence
27   from Mr. Mahle, as Mr. Mahle never worked with or supervised Mr. Lopez.  Although the Court
     is concerned about prejudice to WinCo from Mr. Lopez's late disclosure, the Court will allow Mr.
28   Mahle's declaration, as that evidence does not change the outcome of the pending motion.

1    party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no

2    reasonable trier of fact could find other than for the moving party.  Id.  But on an issue for which

3    the opposing party will have the burden of proof at trial, the moving party need only point out

4    "that there is an absence of evidence to support the nonmoving party's case."  Id.

5           Once the moving party meets its initial burden, the nonmoving party must go beyond the

6    pleadings to demonstrate the existence of a genuine dispute of material fact by "citing to specific

7    parts of material in the record" or "showing that the materials cited do not establish the absence or

8    presence of a genuine dispute."  Fed. R. Civ. P. 56(c).  A triable dispute of fact exists only if there

9    is sufficient evidence favoring the nonmoving party to allow a jury to return a verdict for that

10   party.  Anderson, 477 U.S. at 249.  If the nonmoving party fails to make this showing, "the

11   moving party is entitled to judgment as a matter of law."  Celotex, 477 U.S. at 323.

## III.    DISCUSSION

### A.    Disability Discrimination Claim

14          Under FEHA, it is unlawful for an employer "to discriminate against the [employee] in

15   compensation or in terms, conditions, or privileges of employment" due to the employee's

16   physical or mental disability.  Cal. Gov't Code § 12940(a).  The McDonnell Douglas Corp. v.

17   Green, 411 U.S. 792 (1973) burden-shifting framework applies to Mr. Lopez's disability

18   discrimination claim under FEHA.  See Guz v. Bechtel Nat'l, Inc., 24 Cal 4th 317, 354 (2000).  It

19   requires Mr. Lopez to first establish a prima facie case of discrimination by showing: (1) that he

20   suffers from a disability; (2) that he was otherwise qualified to do his job; (3) that he was

21   subjected to an adverse employment action; and (4) indica of discriminatory motive.  See Faust v.

22   Cal. Portland Cement Co., 150 Cal. App. 4th 729, 745 (2007).  If Mr. Lopez can establish all of

23   the elements of a prima facie case, WinCo would then have the burden of proffering a legitimate,

24   non-discriminatory reason for its adverse employment actions.  See id.  If WinCo can do so, the

25   burden would shift back to Mr. Lopez to offer evidence that WinCo's stated reason was either

26   false or pretextual, or evidence that WinCo acted with discriminatory animus, or evidence of each

27   that would permit a reasonable factfinder to conclude that WinCo intentionally discriminated

28   against him.  See id.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Mr. Lopez contends that three actions by WinCo demonstrate disability discrimination: (1)

2    his transfer to the Vacaville store, (2) his suspension, and (3) his termination.  See Opp'n at 12.

3              **1.       Transfer to Vacaville**

4    Mr. Lopez first points to his transfer to the Vacaville store as an adverse employment

5    action that he suffered as a result of disability discrimination.  See Opp'n at 12–14.  This does not

6    hold water.

7    It is true that the Ninth Circuit takes an "expansive view of the type of actions that can be

8    considered adverse employment actions," and that specifically "disadvantageous transfers or

9    assignments" can constitute adverse employment actions.  See Ray v. Henderson, 217 F.3d 1234,

10   1241 (9th Cir. 2000).  Even so, it is difficult to see how transfer from the Pittsburg store, a place

11   that reportedly "sucks the life out of you," see Lopez Depo. Ex. 7, to most anywhere else—even a

12   store with human resource issues, Tambling Decl. Ex. A (Lopez Depo.) at 120:10–6, that was

13   "dirty, in poor repair, dimly lit" and "needed painting in many areas," id. at 152:18–22, and that

14   featured one of the worst produce departments in the district, id. at 152:23–25—is a

15   disadvantageous transfer.  Mr. Lopez retained the same title at both stores and his responsibilities

16   remained the same at both stores.  He did not have job duties transferred away from him.  See

17   Yartzoff v. Thomas, 809 F.2d 1371, 1373 (9th Cir. 1987).

18   Nor did Mr. Lopez find himself transferred without his consent.  See St. John v.

19   Employment Development Dept., 642 F.2d 273, 274 (9th Cir. 1981).  Mr. Lopez asked for and

20   accepted the transfer.  He did so hoping that "there would be less chances that I would be

21   assaulted or get beat up," Lopez Depo. at 121:16–18, and does not recall being assaulted at the

22   Vacaville store, id. at 121:21–24.  The Ninth Circuit defines an "adverse employment action" as

23   one "likely to deter employees from engaging in protected activity," Ray, 217 F.3d at 1243, and

24   also as one that "materially affect[s] the compensation, terms, conditions, or privileges of . . .

25   employment," Martinez v. Costco Wholesale Corp., 481 F. Supp. 3d 1076, 1091 (S.D. Cal. 2020)

26   (internal quotation marks omitted).  Transferring a store manager from one store where he was

27   "threatened and assaulted multiple times by customers and shoplifters," Lopez Depo. at 50:20–

28   53:20—at his request and with his consent—to another store where he was not threatened or

16

1   assaulted meets neither definition.

2          Even if the transfer to Vacaville constituted an adverse employment action, though, Mr.

3   Lopez's argument that WinCo undertook that action because of discriminatory motive plainly

4   fails.  Mr. Lopez argues: "The timing of Mr. Lopez's transfer also raises an inference of

5   discriminatory animus" because "Mr. Lopez disclosed his disability on December 10, 2018" and

6   "WinCo transferred Mr. Lopez to [the Vacaville store] almost immediately thereafter, on January

7   13, 2019."  Opp'n at 13.  But that factual recitation is incomplete.  Mr. Lopez did not just disclose

8   his disability in his December 10 email; the "main reason" for that email was to request a transfer

9   out of Pittsburg.  See Lopez Depo. Ex. 7.  That WinCo transferred Mr. Lopez so soon after he

10  requested a transfer is not suspicious.  Mr. Lopez thus fails to meet the "indica of discriminatory

11  motive" requirement to establish a prima facie case.[6]  See Faust, 150 Cal. App. 4th at 745.

12         The transfer to Vacaville does not support a disability discrimination claim.

13              **2.     Suspension**

14         The second basis for Mr. Lopez's disability discrimination claim is his suspension.  See

15  Opp'n at 12.

16              **a.     Prima Facie Case**

17         Mr. Lopez argues that his suspension—indisputably an adverse employment action—

18  resulted from discriminatory motives.  See Opp'n at 14–15.  WinCo argues that no one at WinCo

19  "ever made any discriminatory or unkind remark about his depression," and so Mr. Lopez cannot

20  establish a prima facie case.  MSJ at 12.  But WinCo cites no authority for the proposition that

21  discriminatory motives must always be revealed through unkind words.  And Mr. Lopez argues

22  that the timing of his suspension—three months after Mr. Lopez disclosed his depression, see

23

24  ---

[6] And even if Mr. Lopez had established a prima facie case of disability discrimination based on
25  his transfer, WinCo has established a legitimate and non-discriminatory reason for the transfer:
    Mr. Lopez asked for the transfer and he accepted it.  Mr. Lopez's argument that "the stated reason
26  for transferring Mr. Lopez to [the Vacaville] store—that no other openings were available—was
    clearly pretextual," see Opp'n at 13, is also incorrect.  Mr. Lopez argues only that WinCo could or
27  should have had other store managers transfer out of their stores so that Mr. Lopez could transfer
    in.  See id. at 14.  He does not contend that there were actually vacancies at any other stores.  He
28  therefore has not established that WinCo's stated reason for transferring Mr. Lopez from Pittsburg
    to Vacaville was pretextual.

United States District Court
Northern District of California

Lopez Depo. Ex. 7, two months after he stated on his proof of workers' compensation claim form

that he was experiencing depression, anxiety, anger, thoughts of self harm, and withdrawal from

family, see Tambling Decl. Ex. I (WC forms), LOPEZ000370–75, during a time when WinCo

knew that Mr. Lopez was seeing a counselor, and just days after Mr. Miller had called Mr. Lopez

and learned that Mr. Lopez was not at the store because he was attending a counseling session,

Tambling Depo. Ex. A (Lopez Depo.) at 123:12–17—arguably supports an inference of a

discriminatory motive.  See Opp'n at 15; Stegall v. Citadel Broadcasting Co., 350 F.3d 1061, 1069

(9th Cir. 2003) (timing of "adverse employment action can by itself constitute sufficient

circumstantial evidence of retaliation").

WinCo's better argument is its next one.

### b.    Legitimate, Non-Discriminatory Reason

WinCo asserts that it has legitimate, non-discriminatory reasons for suspending Mr. Lopez:

the Vacaville store conditions observed on March 17, 24, and 26, 2019, and Mr. Lopez's failure to

walk the produce department later in the day on March 26, 2019.  MSJ at 12.  Poor job

performance is a legitimate, non-discriminatory reason for an adverse employment action.  See

Pottenger v. Potlatch Corp., 329 F.3d 740, 746 (9th Cir. 2003).

### c.    Pretext

Mr. Lopez responds that WinCo's reasoning for his suspension was pretextual and that he

was suspended not because of the poor store conditions but because of his disability.  See Opp'n at

14–15.  A plaintiff

> cannot simply show that the employer's decision was wrong or
> mistaken, since the factual dispute at issue is whether discriminatory
> animus motivated the employer, not whether the employer is wise,
> shrewd, prudent, or competent.  [Citations.]  Rather, the [employee]
> must demonstrate such weaknesses, implausibilities, inconsistencies,
> incoherencies, or contradictions in the employer's proffered
> legitimate reasons for its action that a reasonable factfinder could
> rationally find them 'unworthy of credence,' [citation], and hence
> infer 'that the employer did not act for the [asserted] non-
> discriminatory reasons.' [Citations.]"

Hersant v. Dept. of Social Services, 57 Cal. App. 4th 997, 1005 (1997).  Employers have the

"leeway to make subjective business decisions, even bad ones."  Pottenger, 329 F.3d at 748.  To

United States District Court
Northern District of California

United States District Court
Northern District of California

1   demonstrate that WinCo's proffered reason was mere pretext, Mr. Lopez "must put forward

2   specific and substantial evidence challenging the credibility of [WinCo's] motives."  See Vasquez

3   v. County of Los Angeles, 349 F.3d 634, 642 (9th Cir. 2003).

4           Mr. Lopez does not dispute that the conditions documented in the March 17 and March 24

5   photographs, and observed on March 26, were unacceptable.  See Lopez Depo. at 146:7–15 (re

6   March 24, assistant manager "made it sound like it wasn't bad," but could not disagree with Mr.

7   Miller about the condition of the store as he was not there); 148:4–150:18 (re March 26, "I feel

8   that day was kind of an outlier more than the norm, the way they make it sound"); 154:10–11

9   ("What Pete saw on the 26th was pretty commonplace before I got there.").  What he argues,

10  instead, is that these poor conditions were typical of the Vacaville store even before his arrival.

11  See Opp'n at 14–15.  He contends that WinCo's proffered reason was pretext because "store

12  conditions far worse than these long predated Mr. Lopez's management of [the Vacaville store]"

13  and WinCo never disciplined the previous store manager for the poor conditions.  See Opp'n at

14  14–15.[7]

15          There is evidence that the Vacaville store's produce department was the worst in the

16  district, and that WinCo "coached" the previous store manager, Mr. Mahle, that "the department

17  needed to be better."  Tambling Decl. Ex. A (Lopez Depo.) at 152:23–25; Mahle Decl. ¶ 6; Fitch

18  Decl. Ex. B (Seashore Depo.) at 81:9–12 (worst in the district when understaffed).  The produce

19  department "was always problematic" "because of staffing issues and bad produce," and yet Mr.

20  Mahle asserts that he "was never written up or disciplined" for its condition.  Mahle Decl. ¶¶ 7–8.

21  On the other hand, Mr. Miller only supervised Mr. Mahle from June 2018 until December 2018,

22  and Mr. Lopez presents no evidence that Mr. Miller observed the same conditions with Mr. Mahle

23  that he did with Mr. Lopez.  See Miller Depo. at 21:13–15; Supp. Pingree Decl. (dkt. 46-2) ¶ 2.  In

24  addition, there were significant differences between Mr. Lopez's tenure and Mr. Mahle's.[8]  Still,

25  _____

26  [7] Mr. Lopez actually argues that WinCo "did not discipline previous SMs"—plural—"for these
    issues," Opp'n at 15, but only cites to evidence regarding the store manager immediately
27  preceding Mr. Lopez, see id. at 15:4–8 (re Mr. Mahle).
    [8] For example, while the store was understaffed at times under Mr. Mahle, "the quality of help was
28  not there when Jason Lopez showed up.  They had the bodies.  They just weren't the right ones."
    Fitch Decl. Ex. B (Seashore Depo.) at 81:15–20; see also id. at 77:17–20 (same).  The problem of

                                                    19

the produce manager for the Vacaville store for the fourteen years before Mr. Lopez was transferred there also said that the department was often understaffed. Tambling Decl. Ex. J (Frazier Depo.) at 21:10–21. He testified that it was not unusual for vegetable displays not to be full or for some of the items to be out of stock. Id. at 49:21–50:13. And Mr. Lopez testified that the produce department had improved dramatically in the couple months that he was there. Lopez Depo. at 154:8–18. While this evidence does not demonstrate that the conditions at the store were "far worse" before Mr. Lopez's tenure, it at least shows that poor conditions in the Vacaville store, specifically the produce department, were not altogether new.

What Mr. Lopez's argument misses, though, is that while the previous store manager may have been coached about improving the produce department, see Mahle Decl. ¶ 6, Mr. Lopez had received a written warning just over a year earlier, before he disclosed his depression to WinCo. Lopez Depo. Ex. 6. The warning detailed numerous similar problems at the Pittsburg store. Id. (listing "acceptable and intolerable store conditions"). And it explained WinCo's expectations. Mr. Lopez was "expected to walk the sales floor . . . on a regular basis to [assess] store conditions and then develop a plan to remedy any issues" to "ensure each department [is] up to Company standards." Id. The warning cautioned Mr. Lopez that "[f]ailure to meet minimum standards and expectations moving forward and/or further violation of any company policy will result in further progressive disciplinary action up to and including your immediate discharge of your at-will employment." Id.

Mr. Lopez was not suspended after the March 17 and 24 incidents; instead, Mr. Miller told him: "We've got to get this fixed. This shouldn't be happening." Miller Depo. at 114:9–14. Mr. Miller told him "that poor store conditions (such as those found on March 17 and March 24) were unacceptable and that serious consequences would occur if such conditions were to take place again in the future." Id. at 122:15–19. When Mr. Miller visited the Vacaville store on March 26,

---

having produce department staff call out increased under Mr. Lopez's watch. See id. at 82:8–24. The produce manager complained that Mr. Lopez would never send help his way" when there were call-outs. Id at 122:18–22. When Mr. Seashore suggested to Mr. Lopez that he hire better quality employees, Mr. Lopez said that he was "too busy to do that," so Mr. Seashore stepped in to helped hire for the first time in nine years. Id. at 83:10–19. There is no evidence that Mr. Mahle exhibited these same problems, aside from suffering from occasional understaffing.

he observed that the produce department was "in complete shambles," with empty produce bins and bad product on display.  Miller Depo. at 117:5–13, 131:25.  The state of the produce department was "particularly concerning" to Mr. Miller as they had just spoken of "the importance of [Mr. Lopez] focusing [his] attention on this critical department."  Miller Depo. Ex. 9.  But Mr. Miller also explained that it was "very disappointing and completely unacceptable that at the time of [the] store visit (approximately noon)[, Mr. Lopez] had failed to return to the [produce] department to check the status of the conditions and ensure the department was ready for our customers."  Id.  Mr. Lopez conceded that on March 26, he "wasn't able to circle back around" to walk the store.  Lopez Depo. at 150:9–18.  The suspension letter emphasized: "You are expected to walk the store at the beginning of your shift and throughout the day to ensure your employees are following your directives. . . ."  Miller Depo. Ex. 9.

In sum, Mr. Lopez's produce department was "in complete shambles" just a couple of days after his supervisor had told him to "get this fixed," and he did not walk the store to identify and remedy problems, which WinCo had directed him, in a written warning, to do.  Given the state of the record, it is not "unworthy of credence" that WinCo suspended Mr. Lopez for his poor job performance, and not because of his disability.  See Hersant, 57 Cal. App. 4th at 1005.

### 3.    Termination

The third basis for Mr. Lopez's disability discrimination claim is his termination.  See Opp'n at 12.

### a.    Prima Facie Case

For the same reasons Mr. Lopez has likely made out a prima facie case as to his suspension, he likely has as to his termination.  In addition to the timing issues discussed above, Mr. Lopez requested FMLA leave on April 27, 2019 for his ongoing depression.  Pingree Decl. Ex. B ("I'm stuck in this cycle of my health affecting my work which affects my health and so on.").  Mr. Miller, Ms. Pingree, and Ms. Lebold decided to terminate his employment while he was on leave.  Miller Depo. at 34:6–22.  They informed Mr. Lopez of his termination when he returned from his leave on May 13, 2019.  Lopez Depo. at 15:13–15; Miller Depo. Ex. 23.  The timing of his request for leave and his termination is some prima facie evidence of discriminatory

21

1   motive.  See Stegall, 350 F.3d at 1069.

2                    **b.      Legitimate, Non-Discriminatory Reason**

3          Again, though, WinCo points to a legitimate, non-discriminatory reason for the adverse

4   employment action: the Vacaville store conditions observed on April 20, 2019, and Mr. Lopez's

5   failure to walk the store that same day.  MSJ at 12.  Poor job performance is a legitimate, non-

6   discriminatory reason for an adverse employment action.  Pottenger, 329 F.3d at 746.

7                    **c.      Pretext**

8          Mr. Lopez argues that WinCo's proffered reason is a pretext and that WinCo really

9   terminated him because of his disability.  See Opp'n at 15–17.  Mr. Lopez argues that "Mr. Miller

10  chose to conduct his visit one day before Easter" and only three days after Mr. Lopez returned

11  from his suspension.  Id. at 16.  He argues that the store was understaffed—something for which

12  WinCo never disciplined Mr. Mahle—and that Mr. Lopez could not have made systematic

13  improvements in the produce department in just three days.  Id.  He argues, too, that he had made

14  significant progress in improving the Vacaville store.  Id. at 16–17.[9]

15         It is not improper for WinCo to inspect a store on the day before Easter or shortly after an

16  employee returns from a suspension.  The evidence is that Mr. Miller visits stores within the

17  Northern District of California every two to three weeks.  Miller Depo. at 27:8–28:12.  Even if he

18  did not ordinarily do so, Mr. Miller had reason to be concerned about Mr. Lopez's performance

19  following his suspension.

20         And, undeniably, the conditions Mr. Miller found during his inspection on April 20 were

21  substandard.  While the produce department had numerous problems (such as out-of-stock items,

22  just three pineapples available for sale, a display in "disarray"), Miller Depo. Ex. 12, the problems

23

24  _____
    [9] Mr. Lopez argues that WinCo failed to preserve all of its reports about his performance at the
25  Vacaville store and so the Court should presume that the information was unfavorable to WinCo.
    Opp'n at 17 (citing Fed. R. Civ. P. 37).  Rule 37 requires that a Court find "that the party acted
26  with the intent to deprive another party of the information's use in the litigation," see Fed. R. Civ.
    P. 37(e)(2) and the Court has no basis to so find.  WinCo represents that it only maintained the
27  records of Mr. Seashore's visits for 15 months, and by the time Mr. Lopez requested them in
    discovery, they had been destroyed.  Reply at 11 n.13.  Because Mr. Seashore did not manage Mr.
28  Lopez and had never been involved in disciplining store managers, see Fitch Decl. Ex. B
    (Seashore Depo.) at 100:4–6, it was reasonable for WinCo not to retain the records.

                                              22

United States District Court
Northern District of California

went beyond the produce department.  This is another contrast with Mr. Mahle, whose problems almost exclusively involved the produce department.  See Mahle Decl. ¶¶ 6–9 (produce department was the worst; never written up for produce department).  The Easter promotion aisle on April 20 "was just in complete disarray" and "just shambles," Miller Depo. at 194:13–25, the chip aisle was messy, the men's bathroom had debris on the floor, and the bulk foods spice area was dirty, Miller Depo. Ex. 12.  The lines were "atrocious," and Mr. Lopez was busy checking out customers at the registers.  Id.; Lopez Depo. at 170:14–17, 190:4–7.  Mr. Lopez does not dispute the state of the store on April 20 but contends that it was a chaotic and intense day.  See Lopez Depo. at 170:8–10.  But that WinCo expects its stores to be "full, fresh, and clean" even on busy days is not for the Court to second-guess.  See Miller Depo. at 206:1–10; Hersant, 57 Cal. App. 4th at 1005 (factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").

Nor in holding Mr. Lopez responsible for the store on April 20 was WinCo asking him to resolve overnight what took six months to resolve after his termination.  There were concrete and achievable steps that WinCo expected Mr. Lopez to take to improve the store in the short term.  Mr. Miller concluded that Mr. Lopez should have been proactive in the days leading up to April 20, checking the schedule and trying to bring in more employees[10]—and if no one was available to work, he should have called Mr. Miller.  Miller Depo. at 171:2–15.  Moreover, Mr. Lopez did not walk the Easter promotion aisle at all until after Mr. Miller arrived on April 20, and did not check the produce department a second time until Mr. Miller arrived.  Miller Depo. at 154:4–155:13; Miller Depo. Ex. 11.  This is still another contrast with Mr. Mahle; there is no evidence that Mr. Mahle regularly failed to walk the store.  Both the failure to bring in adequate additional help (or to seek help from his superiors) and the failure to walk the store plainly contributed to the unsatisfactory conditions at the store on April 20.  See Miller Depo. Ex. 12 (explaining, "you did not provide the necessary staffing assistance nor did you adequately monitor progress throughout the morning to make sure it was acceptable for our customers" and "[e]ven after numerous

---

[10] He did apparently bring in one, but not a cashier.  See Tambling Decl. Ex. N (5/17/19 email).

discussions and being disciplined for unacceptable conditions. . . . you failed to take ownership of the situation"). Moreover, both followed a series of other incidents from which Mr. Lopez could have learned. See id. ("WinCo Foods has been continually addressing ongoing performance concerns. . . . Under your management, we have now had two stores . . . that have not consistently demonstrated [WinCo's goals]."). Mr. Lopez's failure to get adequate help for a busy day when the schedule showed that the store would be understaffed was contrary to the instruction in his April 2019 suspension letter that he "make use of the numerous resources available . . . when difficulties arise by contacting" Mr. Miller, Ms. Pingree, or others. See Lopez Depo. Ex. 9. His failure to adequately walk the store was contrary to the directive he had received in his written warning in January 2018, Lopez Depo. Ex. 6, and which WinCo repeated in his April 2019 suspension letter, Miller Depo. Ex. 9.

Given the state of the record, it is not "unworthy of credence" that WinCo suspended Mr. Lopez for his poor job performance, and not because of his disability. See Hersant, 57 Cal. App. 4th at 1005.

Accordingly, the disability discrimination claim fails.

**B.      Reasonable Accommodation Claim**

"FEHA requires employers to make reasonable accommodation for the known disability of an employee unless doing so would produce undue hardship to the employer's operation." Nealy v. City of Santa Monica, 234 Cal. App. 4th 359, 373 (2015). To prevail on a reasonable accommodation claim, Mr. Lopez must establish that: (1) he has a disability; (2) he could perform the essential functions of the job with reasonable accommodation; and (3) WinCo failed to reasonably accommodate his disability. See id. Mr. Lopez argues that he requested three accommodations for his disability—(1) "transfer to a non-struggling store or a store closer to his support network"; (2) time off to attend counseling; and (3) FMLA leave—and that WinCo denied him all three. Opp'n at 17.[11]

---

[11] Earlier in his opposition brief, Mr. Lopez suggests that WinCo should have provided a fourth reasonable accommodation, in January 2018, when he was exhibiting "signs of depression that would have been clear to anyone who interacted with him," including weight gain and a disheveled appearance. Opp'n at 3–4. He also points to his crying in front of his supervisor when

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.   Transfer

Mr. Lopez argues that he requested "transfer to a non-struggling store" and for WinCo to accommodate his disability "by removing him from the stressful work environment at the Pittsburg store and bringing him closer to his support network." Id. What he actually requested in his December 10, 2018 email was "a lateral transfer to Northern Nevada." See Lopez Depo. Ex. 7. He explained that the Pittsburg store "sucks the life out of you," that he did not feel safe there, that it had "grown increasingly harder to forget about the times I've been threatened, assaulted, nearly stabbed, and so on" and that the store "feel[s] like being in a third world country." Id. He described his family's problems with the Pittsburg area. Id.[12] When he met with Ms. Pingree the next day, he told her that he would also be open to transferring to the Roseville, Folsom, or Tracy stores. Tambling Decl. Ex. A (Lopez Depo.) at 116:9–16.[13]

There were no openings at the time of Mr. Lopez's transfer request. Miller Depo. at 60:19–61:6 ("There were no openings"), 82:23–83:1 (neither Reno store had openings).[14]   Mr.

---

he received the written warning about the conditions in the Pittsburg store. Id. at 4. And he complains that "WinCo made no attempts to engage in the interactive process or provide a reasonable accommodation at that time." Id. (citing Lopez Decl. ¶ 5). Mr. Lopez does not pursue this argument later in his brief when listing the three accommodations he was denied. See id. at 17 (listing accommodations and not including one from January 2018). Indeed, while "an employee is not required to use any particular language when requesting an accommodation," Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1089 (9th Cir. 2002), in January 2018, Mr. Lopez made no request whatsoever. Nor is there any evidence that WinCo was aware that Mr. Lopez needed an accommodation in January 2018, see Fitch Decl. Ex. B (Seashore Depo.) at 135:8–14 (not aware that Mr. Lopez had a medical issue); Fitch Decl. Ex. C (Pingree Depo.) at 83:25–84:8 (had not noticed that Mr. Lopez gained weight or looked disheveled); Fitch Decl. Ex. D (Miller Depo.) at 78:17–23 (did not notice weight gain or unkempt appearance in Pittsburg). Nor has Mr. Lopez identified what accommodation he needed in January 2018. See Zivkovic, 302 F.3d at 1088 ("employee bears the burden of proving the existence of specific reasonable accommodations that the employer failed to provide.").

[12] Mr. Lopez did not provide any medical documentation along with this request; in addition, the doctor's note he sent on December 13, 2018 stated that he could work "regular duty" and did not mention transferring from Pittsburg. See Supp. Pingree Decl. Ex. B.

[13] Mr. Lopez suggests that Ms. Pingree erred in not creating a reasonable accommodation file for him and in not providing him with reasonable accommodation paperwork, although he does not state the legal significance of that error. See Opp'n at 5. Ms. Pingree testified without contradiction that Mr. Lopez had access to the reasonable accommodation paperwork. Tambling Decl. Ex. F (Pingree Depo.) at 174:4–6. And regardless of the administrative process Ms. Pingree used, Mr. Lopez did receive a transfer.

[14] Mr. Lopez asserts that WinCo's claim that "The Only Store Manager Job That Was Open Was in Vacaville" "is flatly false." See Opp'n at 13. Not so. While WinCo rotated other employees to fill the opening created when Mr. Lopez left the Pittsburg store, the undisputed evidence is that there were no vacancies available when Mr. Lopez first requested a transfer, and none opened up until the vacancy in Vacaville. See Reply at 5; Opp'n at 6 (citing Tambling Decl. Ex. B (WinCo

United States District Court
Northern District of California

1   Miller did not recall asking other store managers if they would transfer stores to accommodate Mr.

2   Lopez.  Tambling Decl. Ex. C (Miller Depo.) at 81:13–82:13.  But he was under no obligation to

3   do so.  FEHA recognizes that reassigning an employee to a "vacant position" is a form of

4   reasonable accommodation.  Green v. Crossmark, Inc., No. 08-02230-VBF(AJWx), 2009 WL

5   10672771, at *2 (C.D. Cal. Sept. 16, 2009).  However, FEHA does not require employers to create

6   new positions to accommodate employees.  Id.; Nadaf-Rahrov v. Neiman Marcus Group, Inc., 166

7   Cal. App. 4th 952, 963 (2008) ("[t]he position must exist and be vacant"); 2 Cal. Code. Regs. §

8   11068(d)(4) ("employer . . . is not required to create a new position to accommodate an employee

9   with a disability to a greater extent than an employer would offer a new position to any employee,

10  regardless of disability.").  Nor was WinCo obligated to bump one of the store managers from

11  Reno, Roseville, Folsom, or Tracy to make a position available for Mr. Lopez.  See Green, 2009

12  WL 10672771, at *2.

13          Mr. Lopez recognized this reality.  See Lopez Depo. Ex. 7 ("I know it could be a long time

14  until a spot opens up again if ever.  I would just ask that you please heavily consider me if a spot

15  does open."); Lopez Depo. at 114:13–115:19 (acknowledging that "WinCo wouldn't be able to

16  just transfer [him] to one of those locations without transferring somebody else out").  He

17  maintains, though, that transferring him to one of the other stores would not have created an undue

18  hardship for WinCo, as it routinely transfers managers between stores.  Opp'n at 18.  Mr. Lopez's

19  evidence for this is that WinCo filled "open SM positions at its stores in Tracy and Reno on the

20  same day it transferred [him] to Vacaville."  Id.  But WinCo explains that those transfers occurred

21  because Mr. Lopez created an opening when he left the Pittsburg store: the Tracy store manager

22  left to fill the Pittsburg opening, and a Reno assistant store manager was promoted to fill the

23  opening in Tracy.  Id.; Opp'n at 6 (citing Tambling Decl. Ex. B (WinCo Partial Transfer Records)

24  at D001107, D001111).  Mr. Lopez also argues that WinCo had transferred him seven times, and

25  that a month after his termination, WinCo transferred eight other managerial employees to other

26  stores.  Opp'n at 18.  But as WinCo points out, Mr. Lopez worked in just three stores as a store

27

28  Partial Transfer Records) at D001107, D001111).

United States District Court
Northern District of California

1    manager and was only transferred to the third, Vacaville, at his own request.  See Reply at 5

2    (citing Lopez Depo. at 19:1–21:7, 33:13–15, 34:20–25).  Moreover, while WinCo concedes that it

3    rotated six store managers in June 2019, no evidence suggests that WinCo routinely did so, or

4    anticipated doing so at the time of Mr. Lopez's transfer request.  See Reply at 5.

5         WinCo did not have an obligation to choose the specific accommodation—a store manager

6    position in Reno—that Mr. Lopez sought.  See Raine v. City of Burbank, 135 Cal. App. 4th 1215,

7    1222 (2006).  It did not have an obligation to transfer him to a stress-free store.  See Zivkovic, 302

8    F.3d at 1088 ("employee bears the burden of proving the existence of specific reasonable

9    accommodations that the employer failed to provide."); Jackson v. County of Los Angeles, 60 Cal.

10   App. 4th 171, 191 (1997) (employee who "had to have a stress-free job" could not work as a

11   safety police officer); Gaul v. Lucent Techs., Inc., 134 F.3d 576, 581 (3d Cir. 1998) ("AT&T

12   could never achieve more than temporary compliance because compliance would depend entirely

13   on Gaul's stress level at any given moment.").  As soon as a store manager position opened up and

14   there was an opportunity to transfer Mr. Lopez away from the Pittsburg store, WinCo offered Mr.

15   Lopez the position, and he accepted it.  Miller Depo. at 83:5–10; Lopez Depo. at 121:16–18.  That

16   was a reasonable accommodation of Mr. Lopez's request for a transfer.[15]

17                    2.        Time Off for Counseling

18        Mr. Lopez next argues that he requested time off to attend counseling, and that WinCo

19   failed to fully accommodate his request because he was "not always able to take time off to attend

20   counseling."  Opp'n at 19.  Mr. Lopez testified, though, that he did not recall Mr. Miller ever

21   denying his request to take time off for counseling sessions.  Lopez Depo. at 113:11–15.  His

22   testimony that Mr. Miller once called him while he was in a counseling session to ask for his

23   whereabouts is insignificant: he did not testify that Mr. Miller criticized him for being at

24   counseling, told him that he should not be at counseling, or prevented him from participating in

25   counseling.  See Tambling Depo. Ex. A (Lopez Depo.) at 123:12–17.  Mr. Lopez testified only

26

27   [15] Because Vacaville is closer to Reno than Pittsburg is, the transfer to Vacaville technically even
     accommodated Mr. Lopez's characterization of his request in his opposition brief: that WinCo
28   "remov[e] him from the stressful work environment at the Pittsburg store and bringing him closer
     to his support network" in Reno.  See Opp'n at 17.

                                              27

that he sometimes had to reschedule sessions because his assistant store managers were not able to be present to provide coverage.  Id. at 113:1–10.  But WinCo requiring him to schedule his counseling sessions at a time that the store had coverage does not mean that it failed to reasonably accommodate him.  In fact, FEHA states in part that "If the employee's need for leave . . . is foreseeable due to a planned medical treatment or supervision, the employee shall make a reasonable effort to schedule the treatment or supervision to avoid disruption to the operations of the employer."  Cal. Gov. Code § 12945.2(e)(2)(h).  Ms. Pingree testified that as far as she knew, WinCo accommodated Mr. Lopez's request to see a counselor.  Tambling Decl. Ex. F (Pingree Depo.) at 99:3–14.   The evidence supports that view.

### 3.     FMLA Leave

The third basis that Mr. Lopez lists for his failure to accommodate claim is that WinCo failed to provide FMLA leave.  Opp'n at 17.  But he includes no argument in support of this basis in his brief, and fails to articulate what a reasonable accommodation would have been.  See Opp'n at 17–19 (only including discussion of two desired accommodations: transfer and time off for counseling).  It is possible that Mr. Lopez mistakenly referenced FMLA leave in this claim, as he has a separate FMLA interference claim, addressed below.  In any case, the evidence demonstrates that WinCo provided Mr. Lopez with the April 26 to May 13, 2019 leave of absence that he requested.

Accordingly, the reasonable accommodation claim fails.

### C.     Failure to Engage Claim

FEHA requires that an employer engage in a "timely, good faith interactive process . . . in response to a request for reasonable accommodation by an employee . . . with a known physical or mental disability of known medical condition."  Cal. Gov. Code § 12940(n).

Mr. Lopez argues first that while Ms. Pingree met with him on December 11, 2018, she "foreclosed any meaningful conversation regarding Mr. Lopez's transfer request to Reno, Tracy, Folsom, or Roseville by falsely stating that Vacaville was the only available accommodation."  Opp'n at 19.  "[T]he availability of a reasonable accommodation . . . is necessary" to a failure to engage claim, and "the burden of proving the availability of a reasonable accommodation rests on

United States District Court
Northern District of California

28

United States District Court
Northern District of California

1   the employee." See Nadaf-Rahrov, 166 Cal. App. 4th at 983–84.  As discussed above, there was

2   no available store manager position at the time of Mr. Lopez's request.  The first position that

3   became available was in the Vacaville store.  Ms. Pingree, who communicated this information to

4   Mr. Lopez and who facilitated his access to counseling sessions by initiating a workers'

5   compensation claim, did not fail to engage.

6           Mr. Lopez further argues that WinCo "ignore[ed] any potential need for further

7   accommodation" when it fired him.  Id. at 20.  But he has not articulated what reasonable

8   accommodation would have been available at the time of his termination, which is his burden.

9   See Scotch v. Art Institute of Calif., 173 Cal. App. 4th 986, 1018 (2009) ("an employee must

10  identify a reasonable accommodation that would have been available at the time the interactive

11  process should have occurred.").

12          Accordingly, the failure to engage claim fails.

13          **D.      Retaliation Claim**

14          FEHA provides that it is unlawful for any employer to retaliate against an employee for

15  engaging in a protected activity.  Cal. Gov. Code § 12940(h).  FEHA retaliation claims are

16  analyzed using the McDonnell Douglas burden shifting framework.  See Leland v. City & Cnty.

17  of San Francisco, 576 F. Supp. 2d 1079, 1094 (N.D. Cal. 2008).  To establish a prima facie case of

18  retaliation, Mr. Lopez must show that (1) he was engaged in a protected activity, (2) WinCo took

19  an adverse employment action against him, and (3) a causal connection existed between the

20  protected activity and the adverse employment action.  Id. (citing Cornwell v. Electra Cent. Credit

21  Union, 439 F.3d 1018, 1034–35 (9th Cir. 2006)).  If Mr. Lopez can establish a prima facie case of

22  retaliation, the burden shifts to WinCo to articulate a legitimate, non-discriminatory reason for its

23  actions.  See id. at 1099.  If WinCo can do so, then the burden shifts back to Mr. Lopez to show

24  that WinCo's proffered reason is pretext.  Id. at 1100.

25          Mr. Lopez seeks to establish a prima facie case by asserting that he engaged in protected

26  activity when he requested reasonable accommodations on December 10, 2018, and that WinCo

27  retaliated against him for that protected activity when it "transferred him to a problematic store in

28  order to impair Plaintiff's job performance," suspended him, and terminated him.  See Compl. ¶¶

                                            29

79–81.  WinCo does not dispute that Mr. Lopez's December 10, 2018 email was protected activity, but challenges the remainder of his prima facie showing.

Mr. Lopez cannot establish a prima facie case that his January transfer to the Vacaville store was retaliation.  As discussed above in connection with the disability discrimination claim, the transfer, at Mr. Lopez's request and with his consent, was not an adverse employment action.[16] Even if Mr. Lopez had established a prima facie case as to his transfer, as discussed above, WinCo has articulated a legitimate and non-discriminatory reason for sending him to the Vacaville store— that Mr. Lopez requested it and consented to it—and Mr. Lopez has not demonstrated that that reason is pretext.

Mr. Lopez's suspension and termination also fail as bases for the retaliation claim.  While both are adverse employment actions, the evidence that they resulted from the December 10, 2018 email is very weak, as there was a four month gap between the email and the suspension, and a five month gap between the email and the termination.  See Arteaga v. Brink's, Inc., 163 Cal. App. 4th 327, 354 (2008) ("[C]ases that accept mere temporal proximity . . . as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.") (internal quotation marks omitted; emphasis in original); see also Shaw v. Abbott Labs, Inc., No. 17-4783 SS, 2018 WL 4853670, at *19 (C.D. Cal. Aug. 13, 2018) (more than six month gap between events "is not compelling evidence of 'proximity'"); Washington v. Cal. City Corr. Ctr., 871 F. Supp. 2d 1010, 1029 (E.D. Cal. 2012) (3-month gap and 4-month gap have been held insufficient).  In addition, "'[e]vidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity.'"  Day v. Sears Holdings Corp., 930 F. Supp. 2d 1146, 1188 (C.D. Cal. 2013) (quoting Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002)).  Here, Mr. Lopez's

---

[16] Moreover, the allegation that WinCo transferred Mr. Lopez "in order to impair [his] job performance" is unsupported.  See id. ¶ 51.  WinCo has submitted evidence that there was no store manager opening at the time of Mr. Lopez's request, see Miller Depo. at 60:19–61:6, 82:23–83:1, and that the first store manager job that became available was in the Vacaville store, because the previous store manager, Mr. Mahle, was terminated, id. at 83:5–10.  There is no evidence that WinCo engineered the opening at the Vacaville store in order to transfer Mr. Lopez to a troubled store and thereby impair his job performance.

written warning from January 2018, which predated his protected activity, highlighted several of the problems cited in his suspension and termination in 2019.  See Lopez Depo. Ex. 6.

Even if Mr. Lopez established a prima facie case of retaliation based on his suspension and termination, though, as discussed above in connection with the disability discrimination claim, WinCo has articulated a legitimate, non-discriminatory reason for the suspension and termination—poor job performance—and Mr. Lopez has failed to demonstrate that that reason is pretext.  See Vasquez, 349 F.3d at 642 (specific and substantial evidence required for pretext); Arteaga, 163 Cal. App. 4th at 354 (temporal proximity is insufficient to demonstrate pretext).[17]

Accordingly, the retaliation claim fails.

### E.   Failure to Prevent Claim

FEHA makes it unlawful for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."  Cal. Gov. Code § 12940(k).  Mr. Lopez argues that "WinCo discriminated and retaliated against [him]" and therefore "there is a triable issue of fact as to whether it failed to prevent those acts."  See Opp'n at 23.  Because Mr. Lopez's discrimination and retaliation claims fail, the failure to prevent claim also fails.  See Leland, 576 F. Supp. 2d at 1103 (element of failure to prevent claim is that "plaintiff was subjected to discrimination, harassment or retaliation").

### F.   FMLA Interference Claim

Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" in the statute or the implementing regulations.  29 U.S.C. § 2615(a)(1), 29 C.F.R. § 825.220(b).  Mr. Lopez argues that WinCo

---

[17] The only additional evidence of pretext that Mr. Lopez points to in support of his retaliation claim is Mr. Mahle's assertion that the employee's son also took pictures of the produce department when Mr. Mahle was store manager but that WinCo did not discipline Mr. Mahle.  See Opp'n at 22.  This assertion does not demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,'" see Hersant, 57 Cal. App. 4th at 1005, as the suspension occurred after Mr. Lopez failed to improve his performance as outlined in the January 2018 written warning, and following Mr. Miller's coaching in connection with the March 17 and 24 photos.  See Lopez Depo. Ex. 9 (Suspension Notice recounting employment history including January 2018 written warning, district manager's having reinforced the expectation of walking the sales floor, March 17 and 24, 2019 incidents, and March 26, 2019 inspection).  The photos alone were not the basis for Mr. Lopez's suspension.  Id.

interfered with his rights under the FMLA by (1) denying him FMLA leave and (2) using his request for FMLA leave as a factor in his termination.[18]   See Compl. ¶ 101.

### 1.   Denying Leave

The only time that Mr. Lopez sought FMLA leave during the relevant time period was for his April 26 to May 13 absence, and WinCo provided him with leave on those dates.  He emailed Mr. Miller and Ms. Pingree on April 27, stating that he would be off of work to attend to his health until May 13.  Pingree Decl. Ex. B.  Ms. Pingree responded, "Please be sure to contact FMLA Source to apply for FMLA protections and notify payroll of your absence so they can process your pay accordingly.  Take care of yourself!"  See id.

Mr. Lopez concedes that WinCo gave him the time off that he desired, but argues that WinCo nonetheless denied him FMLA leave.  Opp'n at 10 (citing Tambling Decl. Ex. R (FMLA denial) at C000664).  Indeed, the cited document, from May 17, 2019, states "FMLA/STATE DENIED 4/26/19–5/12/19."  See Tambling Decl. Ex. R (FMLA denial) at C000664.  WinCo asserts that "[t]he only reason this leave was not designated as FMLA leave is because Lopez was terminated before he was able to submit the necessary documentation, but that is immaterial because Lopez was provided the leave."  MSJ at 18.  Mr. Lopez does not articulate why it is significant that the leave he was granted was not called FMLA leave.  In fact, he does not include any argument in support of this basis for his FMLA interference claim in his brief whatsoever. See Opp'n at 24–25 (arguing only that WinCo retaliated against him for taking leave).  Asked about this issue at the motion hearing, Mr. Lopez conceded that he was granted FMLA leave even though it was not so designated.  As WinCo did not interfere with Mr. Lopez's right to take leave,

---

[18] Mr. Lopez uses the word "retaliation" in connection with this claim, see id., Opp'n at 15 ("he was retaliated against for requesting FMLA leave."), 24 ("There is a Triable Issue of Fact as to Whether WinCo Interfered with Mr. Lopez's Rights under the FMLA or Retaliated Against Mr. Lopez for Requesting FMLA [L]eave.").  The Ninth Circuit, though, has held that it is error to apply the McDonnell Douglas burden shifting test to a claim that taking FMLA-qualified leave influenced a decision to terminate an employee, and that only when the claim involves an employee being punished for opposing unlawful practices is the issue one of retaliation.  See Xin Liu v. Amway Corp., 347 F.3d 1125, 1136 (9th Cir. 2003).  This Court therefore uses the Circuit's prescribed language and analysis.  See Sutton v. DeRosia, No. 1:11-CV-01426-LJO-JLT, 2012 WL 4863788, at *9 (E.D. Cal. Oct. 12, 2012) ("Although plaintiff labels her claim as a retaliation claim, it is actually an interference claim.").

1     this basis for the claim fails.

2                    **2.      Using Leave as a Factor in Termination**

3              Nor has Mr. Lopez raised a triable issue of fact as to whether WinCo used Mr. Lopez's

4     leave as a factor in his termination.  "[A]n employee may prevail on a claim that an employer

5     interfered with [his] rights by terminating [him] in violation of FMLA by showing, by a

6     preponderance of the evidence[,] that [his] taking of FMLA-protected leave constituted a negative

7     factor in the decision to terminate [him]."  <u>Xin Liu</u>, 347 F.3d at 1135–36.  Mr. Lopez claims to

8     have met this burden, citing <u>Xin Liu</u> for the proposition that "[W]here an employee is subjected to

9     'negative consequences . . . simply because he has used FMLA leave,' the employer has interfered

10    with the employee's rights."  Opp'n at 24 (citing <u>Xin Liu</u>, 347 F.3d at 1135–36).

11             But Mr. Lopez was not terminated "simply" for taking FMLA leave.  The only evidence of

12    causation that Mr. Lopez points to is that WinCo terminated him just fifteen days after he

13    requested leave.  Opp'n at 24–25 ("[t]he timing alone is compelling evidence that WinCo's actions

14    were retaliatory.").  But "[e]vidence that the employer had been concerned about a problem before

15    the employee engaged in the protected activity undercuts the significance of the temporal

16    proximity."  <u>See Day</u>, 930 F. Supp. 2d at 1188 (in the context of FEHA claim).  Here, following

17    progressively severe disciplinary action, <u>see</u> Lopez Ex. 6 (written warning); Miller Depo. at

18    114:9–14. ("We've got to get this fixed.  This shouldn't be happening."); Miller Depo. Ex. 9

19    (Notice of Disciplinary Suspension), Mr. Lopez's store was the subject of an inspection on April

20    20, and that inspection <u>had not gone well</u>.  <u>See</u> Miller Depo. Ex. 23 ("unacceptable"; "not

21    presentable"; "disturbing"; "atrocious").  Mr. Lopez had not yet been disciplined for the April 20

22    inspection at the time he took leave.

23             WinCo was not required to withhold discipline because Mr. Lopez took leave.  <u>See</u>

24    <u>Fleming v. IASIS Healthcare Corp.</u>, 151 F. Supp. 3d 1043, 1055 (D. Ariz. 2015) (rule that timing

25    alone would create a triable issue of fact on this issue "would place employers in a dilemma as to

26    any unsatisfactory employee who requests leave: either keep him or face trial.  The FMLA does

27    not impose this Hobson's choice.").  And Mr. Lopez was not entitled to stay in his position simply

28    because he took leave.  <u>See</u> 29 U.S.C. § 2614(a)(3)(B) (FMLA does not entitle employees to "any

United States District Court
Northern District of California

33

United States District Court
Northern District of California

1  right, benefit, or position of employment other than any right, benefit, or position to which the

2  employee would have been entitled had the employee not taken leave.").

3        Mr. Lopez has not demonstrated by a preponderance of the evidence that WinCo used his

4  leave as a negative factor in the decision to terminate him.  See Xin Liu, 347 F.3d at 1136.  To the

5  contrary, the evidence demonstrates that WinCo decided to terminate him when he returned from

6  leave because of continued poor performance.[19]  Accordingly, this basis for the FMLA

7  interference claim also fails.

8        **G.     Punitive Damages**

9        Mr. Lopez's complaint alleges repeatedly that WinCo acted "oppressively and maliciously,

10  with the wrongful intention of injuring Plaintiff, from an evil and improper motive amounting to

11  malice," entitling Mr. Lopez to punitive damages.  See, e.g., Compl. ¶¶ 55, 65.  In his opposition

12  brief, Mr. Lopez argues that the basis for his request for punitive damages is that "WinCo, a

13  corporate giant of the grocery industry, discriminated and retaliated against Mr. Lopez, a long-

14  term employee, after he made his work related disabilities known and requested

15  accommodations."  Opp'n at 25.  Because this Court concludes that WinCo did not violate Mr.

16  Lopez's rights, it also concludes that Mr. Lopez is not entitled to punitive damages.

17  **IV.   CONCLUSION**

18        For the foregoing reasons, the Court GRANTS WinCo's motion.

19        **IT IS SO ORDERED.**

20        Dated: August 25, 2021

                                            CHARLES R. BREYER
21                                          United States District Judge

22

23

24

25

26

27  _____

[19] Mr. Lopez also testified that he had applied for and been granted FMLA leave in the past, Lopez
28  Depo. at 44:16–25, 177:9–11, which further undermines the notion that his leave played any role
    in his termination.

34